6                                                25 Mass. App. Ct. 6

St. Paul Fire & Marine Ins. Co. *v.* Boston Housing Authority.

ST. PAUL FIRE AND MARINE INSURANCE COMPANY *vs.*
BOSTON HOUSING AUTHORITY.

No. 86-1229.

Suffolk.    September 15, 1987. — October 23, 1987.

Present: GREANEY, C.J., CUTTER, & WARNER, JJ.

*Insurance*, Bond, Embezzlement, Misrepresentation, Disclaimer of liability.

In an action by an insurer seeking a declaration of its rights and obligations
    under two public employees' blanket bonds, this court held that prom-
    issory representations by a public authority in its applications for the
    bonds had the general effect of warranties within the meaning of G. L.
    c. 175, § 186, and, in the circumstances, the inaccuracy of the represen-
    tations increased the risk of loss as matter of law. [12-13]
A public authority which, in its application for public employees' blanket
    bonds, represented that its bank statements would "be reconciled monthly
    by someone not authorized to deposit or withdraw," had not, on the
    record in summary judgment proceedings, substantially complied with
    its representations, with the result that the insurer was entitled, under
    G. L. c. 175, § 186, to deny coverage of a claim on the bonds for over
    $350,000 embezzled from the authority's payroll account. [13-14]

CIVIL ACTION commenced in the Superior Court Department
on February 20, 1985.

A motion for summary judgment was heard by *Haskell C.
Freedman*, J., sitting under statutory authority.

*Wilbur E. Commodore* (*Rodney Solomon* with him) for the
defendant.

*Allen N. David* for the plaintiff.

CUTTER, J. The plaintiff company (the insurer) on February
20, 1985, filed a complaint seeking a declaration of its rights
and its obligations (if any) to the Boston Housing Authority
(BHA) under two public employees' blanket bonds (the bonds)
in circumstances outlined in the complaint. BHA filed an an-
swer and counterclaims. Responses were received to requests
by both the insurer and BHA for admission of facts.

BHA, on April 2, 1986, filed a motion, supported by an affidavit, for partial summary judgment.[1] The insurer, on June 10, 1986, filed a motion for total summary judgment for it, supported by affidavits. The motion judge denied BHA's motion and on June 30, 1986, allowed (with a short memorandum) the insurer's motion. BHA has appealed.

A. *Background Facts*

The facts summarized in part A of this opinion we treat as essentially undisputed.[2]

1. From November 28, 1978, through November 28, 1981, BHA was the insured under two public employees' blanket fidelity bonds issued by the insurer. On September 17, 1981, the insurer's bond manager sent to Geraldine Scotti, "Insurance Officer" for BHA, a renewal application for the fidelity bonds and a letter stating, among other things, "The policy you have now is continuous and will stay in effect. The renewal application is needed to compute the renewal premium."

2. The completed renewal application contained the following sequence of questions and answers: [Q] "Audits: By whom? [A] C.P.A. [box checked] . . . BIANNUAL [*sic*] AUDIT REQUIRED[,] ARTHUR YOUNG & CO. MOST RECENT AUDITOR . . . . [Q] When was last audit made? [A] 3/31 1980 . . . . [Q] Will bank statements be reconciled monthly by someone not authorized to deposit or withdraw? [A] Yes. [box checked]. [Q] Who will reconcile? [A] Finance-Accounting Dept." The last two questions and answers give rise to the present controversy. BHA returned the completed application, signed by Miss Scotti, on October 30, 1981.

---

[1] No action appears to have been taken on a second motion, filed by BHA on July 31, 1986, entitled "motion for entry of judgment pursuant to Rule 54(b)," other than to enter judgment generally for the insurer on September 10, 1986. See Mass.R.Civ.P. 54(b), 365 Mass. 821 (1974).

[2] The docket reveals no motion to strike from the record as inaccurate any part of any pleading, answer to requests for admissions, or affidavit (including attached documents, transcripts of hearings, and exhibits). See *Stetson* v. *Selectmen of Carlisle*, 369 Mass. 755, 763 n.12 (1976); *Madsen* v. *Erwin*, 395 Mass. 715, 720-722 (1985); 10A Wright & Miller, Federal Practice and Procedure § 2738, at 507, 511 (2d ed. 1983 & Supp. 1987); Smith & Zobel, Rules Practice §§ 56.5-56.8 (1977 & Supp. 1987).

3. BHA first employed James Deas (known to it as Andrew Adams) in April, 1982, as a temporary employee in its finance and accounting department. In September, 1982, BHA hired him as supervisor of the payroll area, a permanent position. He remained in that position until September 21, 1984.

4. As payroll supervisor, Deas was custodian of manual payroll checks and was authorized to issue payroll checks (using a facsimile signature) in amounts less than $1,000. Deas was specifically assigned to reconcile certain accounts (not including the payroll account) and was authorized to reconcile any account other than the payroll account.

5. James Kalil, an employee of BHA's accounting staff, was responsible for seeing that reconciliations were done when and as required, and that each account was reconciled by an accountant not responsible for the records of the account. During Kalil's employment, there were at least twenty-five accounts to be reconciled on a monthly basis. The payroll account was the most complex account.

6. During Deas's two-year tenure as payroll supervisor, no other accountant reconciled the payroll account. Deas, during this period, was embezzling money by writing checks to himself on the manual payroll stock of checks and endorsing and depositing them to his personal bank account. Other BHA employees attempted on several occasions to obtain from Deas the materials needed for an independent reconciliation of the payroll account. Deas, however, always had an excuse which was accepted.

7. BHA had at least the following knowledge that accounting functions were not being segregated. BHA's independent outside auditor, in its management letter evaluation (for BHA's use) for the two-year period ending March 31, 1982, noted (in referring to cash disbursements) that the individual responsible for check sequence, who had access to blank checks, also performed the bank reconciliation. The BHA response was that, prior to the audit, the objective assignment of bank reconciliations was recognized as desirable and such assignments had been made.[3]

_____

[3] In its evaluation for the two-year period ending March 31, 1984, after a part of Deas's embezzlement had taken place, BHA's auditor noted a

8. Beginning in October, 1981, Sarah Stratman was BHA's director of finance and accounting. For about two years, Mrs. Stratman was aware that Kalil was not enforcing the segregation-of-duties policy. In September, 1982, Mrs. Stratman distributed to all program accountants in the finance and accounting department a memorandum assigning the responsibilities for bank reconciliations of a number of specific accounts. Mrs. Stratman frequently reminded Kalil of his responsibility regarding bank statement reconciliations.

9. No extra precautions were taken as a result of Mrs. Stratman's knowledge of the lack of enforcement of the segregation-of-duties policy. Had BHA removed reconciliation supervision from Kalil's area of responsibility, it would have lost a ground for termination of Kalil's services for BHA (apparently then under consideration). Eventually Kalil was discharged for cause.

10. On September 21, 1984, a Boston bank called Mrs. Stratman about multiple payroll checks being deposited in Deas's (Andrew Adams's) personal account with that bank. Deas was later arrested for embezzling over $350,000 from BHA. BHA recovered $50,000 from an insurer and $14,144.22 from Deas's assets. The total loss was determined to be $355,343.69.

11. About September 24, 1984, BHA notified the insurer of its claim on the bonds. It estimated the loss at $365,000 at that time. The insurer denied coverage.

12. An affidavit of an underwriter for the insurer stated that failure to segregate accounting functions significantly increases the risk of fidelity losses. The increase of risk, of course, was illustrated by the circumstances of Deas's embezzlement.

B. *Effect of G. L. c. 175, § 186.*

This case requires consideration of the effect to be given to G. L. c. 175, § 186, which reads: "No oral or written misrepresentation or warranty made in the negotiation of a policy of

segregation-of-duties problem regarding the payroll account specifically, and BHA responded that its segregation-of-duties policy had not been observed during the most recent fiscal periods, but that personnel adjustments had been made.

insurance by the insured or in his behalf shall be deemed material or defeat or avoid the policy or prevent its attaching unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter misrepresented or made a warranty *increased the risk of loss*" (emphasis supplied). There is no significant contention by the insurer that BHA in its application (see part A, 2, *supra*) gave "with actual intent to deceive" its answers to the questions about the reconciliation of bank statements monthly, although there is a slight suggestion of such a contention in its brief.[4] It does not seem to be contended that the language of the bonds was sufficiently explicit to make the accuracy of the representations a "condition precedent" to any liability of the insurer upon the bonds. Cf. *Charles, Henry & Crowley Co.* v. *Home Ins. Co.*, 349 Mass. 723, 726-727 (1965). In that decision, the Supreme Judicial Court (at 727) distinguished *Goldstein* v. *Royal Indem. Co.*, 297 Mass. 55 (1937), as "not . . . applicable" to the facts then before the court because it regarded the explicit language (in the case before it) of "the representations as a condition precedent to recovery," thus making G. L. c. 175, § 186, "not applicable to the policy." The less explicit and definite representations in the present case, however, we think, are governed by § 186, and, if they were violated by BHA, the effect of the representations must be evaluated by whether the violations increased the risk of loss.

As Judge Keeton,[5] said in *Shapiro* v. *American Home Assur. Co.*, 584 F. Supp. 1245, 1249 (D. Mass. 1984), of § 186, "The Massachusetts statute is declaratory of longstanding common law principles defining the . . . [sort] of false representations that can serve to avoid an insurance policy." In *Pahigian* v. *Manufacturers' Life Ins. Co.*, 349 Mass. 78, 85 (1965), it was said, "Misrepresentations by the insured . . . which increase

---

[4] In any event, we confine our exploration of the effect of BHA's alleged violation of its promissory representations to whether the violations "increased the risk of loss" within the meaning of § 186.

[5] The author of a text on insurance law. See Keeton, Insurance Law § 6.5(c), at 383-393 (1971).

the risk of loss will, if proved, enable the . . . [insurer] to avoid the policy," citing § 186. That a representation is promissory in character does not appear to affect the situation under § 186.

Promissory representations have been treated as constituting warranties, violations of which may affect the risk of loss and provide a defense to the insurer, as in the *Goldstein* case, 297 Mass. at 57-58.[6] For a case prior to the enactment of the first predecessor of § 186, see, e.g., *Houghton* v. *Manufacturers' Mut. Fire Ins. Co.*, 8 Met. 114, 123-126 (1844). It may well be that, prior to the enactment of what is now § 186, promissory representations would not be enforced unless they constituted warranties. See generally the following treatises (which may not take into account completely the effect of § 186): 9 Appleman, Insurance Law & Practice, § 5292, at 239-40 (rev. ed. 1981); 9 Couch, Insurance 2d, § 37B:407-408 (rev. ed. 1985). See also 7 Couch, Insurance 2d, §§ 35:100-104 (rev. ed. 1985). As to the general effect of § 186 and its predecessor statutes, see *Everson* v. *General Acc., Fire & Life Assur. Corp.*, 202

---

[6] It is not clear from the opinion in the *Charles, Henry, & Crowley Co.* case, 349 Mass. at 727, why that decision treated the *Goldstein* case, 297 Mass. 55, as not applicable to the facts before the later court. In any event, the *Goldstein* opinion (at 58) regarded the promissory representations considered in that case as equally binding on the insured whether included in the policy itself or in negotiations preceding the issue of the policy and as constituting a warranty. Whether or not subject to § 186, the court obviously dealt with the violation of that warranty as increasing the risk of loss as matter of law. See also what was said in *Everson* v. *General Acc., Fire & Life Assur. Corp.*, 202 Mass. 169, 173 (1909), that the "distinction between warranty and condition is accentuated by the statute now under consideration. It prohibits the parties to an insurance contract from attaching to a breach of a warranty the effect of defeating all rights of the insured under the policy, unless in good conscience it ought to have this result, either as increasing the risk or made with intent to deceive. The harshness of the clause formerly common in contracts of insurance, that warranties, if found in any respect untrue, should avoid the policy, is thus mitigated. Under such a provision the conclusion was inevitable that there could be no recovery, if the truth of a statement, although in fact immaterial and not affecting the risk, was made the basis of the contract and it turned out to be false. . . . Being remedial legislation the statute must be liberally construed. It follows that the statements in the 'schedule of warranties' were made in the negotiation of the insurance contract" (citations omitted).

Mass. 169, 171-174 (1909). Compare *Elder* v. *Federal Ins. Co.*, 213 Mass. 389, 391 (1913, where a predecessor of § 186 was held not applicable).

In *Metropolitan Life Ins. Co.* v. *Burno*, 309 Mass. 7, 11 (1941), Mr. Justice Lummus said that § 186 "was intended to make a breach of warranty no more onerous for the insured than a false representation. This statute, it has been said, was declaratory as to representations, but changed the law as to warranties." The case cited *Barker* v. *Metropolitan Life Ins. Co.*, 198 Mass. 375, 383-384 (1908). See also *Bolta Rubber Co.* v. *Lowell Trucking Corp.*, 304 Mass. 426, 428-429 (1939), cert. denied, 309 U.S. 690 (1940); Vance, Insurance, §§ 72-75, esp. at 418 (3d ed. 1951).

BHA first contends essentially that the insurer cannot avoid the insurance policies unless BHA made a misrepresentation for the future with fraudulent intent. If the answers made in the policy application (with respect to independent monthly reconciliations of bank statements) were representations, the Massachusetts cases at common law required that, so far as they related to the future, they had to be made in *good faith* and *without* intent to deceive and also they had to be observed fairly and substantially.[7] We think that the cases so holding dispose of BHA's contention.

---

[7] In the *Houghton* case, 8 Met. at 120, the Supreme Judicial Court determined that the policy terms relied on by the insurer in that case were representations, which so far as executory "shall be *substantially complied with*; but not like warranties . . . requiring an exact and literal compliance. It is enough . . . if these statements, relied on as the basis of the contract, *are made in good faith and without intent to deceive*; that they are substantially true and correct as to existing circumstances, and *substantially complied with*, so far as they are executory and regard the future" (emphasis supplied). In *Daniels* v. *Hudson River Fire Ins. Co.*, 12 Cush. 416, 418, 423 (1853), the court approved jury instructions that with respect to "representations" (not warranties) "so far as they related to the future, — to things to be done, and rules and precautions to be observed, — they were stipulations to be fairly and *substantially complied with*" (emphasis supplied). On the facts of the present case, BHA's promissory representations cannot be viewed as mere statements of expectation or intention outside the policies, barred by the parol evidence rule, see, e.g., *Bryant* v. *Ocean Ins. Co.*, 22 Pick. 200, 206 (1839), but, in the light of the decisions applying § 186, must be treated as having in general about the effect of pre-§ 186 warranties, because material to the risk.

The authorities already cited, not altogether consistent, leave significant uncertainty about the effect of G. L. c. 175, § 186, in the present situation and about the extent to which only substantial compliance with a promissory representation is required in a case to which § 186 is applicable. We apply the authorities as we appraise their combined effect.

We hold that the promissory representations (about the reconciliations of bank statements) set out in the application for the two bonds (see par. A, 2, *supra*) here considered are to be treated as having the general effect of warranties and dealt with in a manner consistent with § 186. We also hold that BHA was under obligation substantially to comply with the representations made in its behalf by its "Insurance Officer" (acting within the scope of her employment as charged by BHA with responsibility for dealing with insurance matters). See 9 Couch, Insurance, § 37B:419, and see the analogy (in considering a matter of knowledge and notice) of Judge Keeton's decision in *Boston Mutual Life Ins. Co.* v. *Fireman's Fund Ins. Co.*, 613 F. Supp. 1090, 1093-1094, 1105 (D. Mass. 1985).

We hold further that, on the facts of record in this case, the violations of the promissory representations, as matter of law, increased the risk of loss (and, indeed, resulted in the loss incurred), as the motion judge correctly ruled.[8] The only possible open question under the cases (see note 7, *supra*) was

---

[8] This was not a case where the inaccuracy of the representation was treated as not "material" because it made no significant difference to the insurer, as in *Employers' Liab. Assur. Corp.* v. *Vella*, 366 Mass. 651, 655-656 (1975). In the present case the violations plainly were material. On this record, different answers to the questions on the application might have substantially increased the premium charge. Compare *In-Towne Restaurant Corp.* v. *Aetna Cas. & Surety Co.*, 9 Mass. App. Ct. 534, 538 (1980). There was obvious reliance upon the representations, although we agree with Judge Keeton that reliance is not a necessary element of proof by the insurer. See the *Shapiro* case, 584 F. Supp. at 1250. The decision in *Boston Y.M.C.A.* v. *Royal Indem. Co.*, 289 Mass. 391, 392-393 (1935), affords little assistance in the present case, because most (if not all) of the noncompliance with the representations in the fidelity policy involved in that case related to a bank account of an entity other than the insured and hence not subject to the representations or the policy in any event.

whether BHA substantially complied with its promissory representations.

Enough facts are undisputed on this record to make it plain that BHA was not in substantial compliance with its representation that bank statements "will be reconciled monthly by someone not authorized to deposit or withdraw." The violations were shown to have continued for a substantial period, and not to have been merely inadvertent, temporary violations. Compare *King Brick Mfg. Co.* v. *Phoenix Ins. Co.*, 164 Mass. 291, 292-295 (1895). See also the *Houghton* case, 8 Met. at 123-125. BHA's director of finance and accounting, with broad duties, knew that independent reconciliations by a person other than Deas (of the bank statements of accounts for which Deas had responsibility) were not being conducted for a considerable period. See part A, 8, *supra.* Although BHA established a policy of complying with the representations, there was abundant indication that BHA's director of finance and accounting knew the policy was not being enforced by employees of BHA having the duty to enforce, and that she tolerated the lack of enforcement, in part, to build up proof of the ineffectiveness of another employee having that duty.

On the record before the motion judge, he could reasonably conclude that the facts did not permit any finding that BHA was in substantial compliance with the representations. See part A, 4-9, *supra.* The fact that there probably was compliance with BHA's policy as to all but one of the twenty-five accounts to be reconciled independently on a monthly basis, and continued failure to comply only as to the account handled by Deas, BHA's most complex account, cannot be regarded as substantial compliance with BHA's policy or with its promissory representation. We hold that the motion judge properly granted summary judgment for the insurer.

*Judgment affirmed.*